IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ELLIPSIS, INC.,

      Plaintiff,

v.                                                    No. 03-2939 B

THE COLOR WORKS, INC.,

      Defendant.
_____

ORDER GRANTING THE COLOR WORKS' MOTION FOR SUMMARY JUDGMENT AND
GRANTING IN PART AND DENYING IN PART THE MOTION OF ELLIPSIS AND WADE
FOR PARTIAL SUMMARY JUDGMENT
_____

      The Plaintiff and Counterdefendant, Ellipsis, Inc. ("Ellipsis" or "Counterdefendant"),

brought this action against the Defendant and Third-Party Plaintiff, The Color Works, Inc. ("TCW"

or "Third-Party Plaintiff"), alleging fraud, tortious interference with business relations and violations

of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-101, et seq.,

arising from business transactions between the parties for the production and delivery of

camouflaged cellular telephone face plates.  Subsequent to the initiation of this action, TCW filed

a counterclaim and third-party complaint against Ellipsis, and Third-Party Defendant, Mary

Elizabeth Wade ("Wade" or "Third-Party Defendant'), the President and owner of Ellipsis, alleging

defamation, tortious interference with business relations, inducement of breach of contract and

violation of the TCPA.  In addition, TCW asserts claims solely against Ellipsis for indemnity,

pursuant to § 47-18-109(e)(2) of the TCPA, as well as for various causes of action for suit on a

sworn account.

Before the Court are the parties' cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Ellipsis and Wade filed a joint motion for partial summary judgment seeking dismissal of the counterclaim and third-party complaint as to all causes of action except those relating to the sworn account on November 21, 2005.[1]  TCW subsequently filed its motion for summary judgment on all claims asserted by Ellipsis on November 22, 2005. As the parties have responded to the motions, the matters are now ready for disposition.

<u>FACTS</u>

The following facts are undisputed unless noted. Ellipsis is a Tennessee corporation, owned and operated by Wade, that markets and sells sporting goods accessories, including replaceable cellular telephone face plates. (Pl.'s Resp. First Set Interrogs. at 3.)  Between the years 2000 and 2004, the Plaintiff sold less than 14,000 face plates total. (Pl.'s Resp. First Set Interrogs. at 4.) From at least 1999 until 2003, Ellipsis held an exclusive license with Realtree Outdoor Products, Inc. ("Realtree") to produce and sell cellular telephone face plates imprinted with Realtree camouflage patterns. (Pl.'s Resp. First Set Interrogs. at 11; Dep. Brian Jennings ("Jennings Dep.") at 10-14; Dep. Mary Elizabeth Wade (January 11, 2005 )("Wade Dep. I") at 34, 50-51.)  Nearly 85% of Ellipsis' business is comprised of camouflaged pattern sunglasses rather than face plates. (Wade Dep. I at 14.) Realtree pairs licensees with authorized processors to make sure that licensees receive quality products. (Pl.'s Resp. First Set Interrogs. at 11.)  During the relevant period, TCW, a decorator and custom painter of electronics and other goods, was a fully licensed decorator of Realtree's proprietary camouflage patterns. (Decl. Telsie Lamie Haga ("Haga Decl.") ¶¶ 3, 4.)

---

[1] In their motion, Ellipsis and Wade concede that there are genuine issues of material fact precluding summary judgment on the causes of action relating to the sworn account. (Counterdefendant and Third-Party Pl.'s Mot. Partial Summ. J. ("TPP's Mot.") at 2.)  Accordingly, the motion does not seek summary judgment on counts 1, 2, and 3 of the amended counterclaim and third-party complaint.

The relationship between Ellipsis and TCW began in February 2001 when Telsie Lamie Haga, who was, at the time, TCW's Director of Sporting Goods, and Wade met at a trade show in Las Vegas, Nevada.  (Haga Decl. ¶ 2; Pl.'s Resp. First Set Interrogs. at 6.)  During a meeting between them, Ellipsis and Wade allege that Haga informed Wade that Nokia had a registered patent on its telephone face plates.  Further, they allege that Haga represented to Wade that TCW was authorized by Nokia to "police" the production of face plates which fit its telephones.  (Wade Dep. I at 60-63.)  According to Ellipsis and Wade, Haga told Wade that, unless Ellipsis agreed to utilize TCW as its sole manufacturer, Nokia would sue Ellipsis for patent infringement. (Wade Dep. I at 60-63.)  TCW has submitted Haga's declaration in which he states that, contrary to Wade and Ellipsis' assertions, TCW did not "overstate the bounds of its vendor agreement with Nokia and/or otherwise  attempt to use Nokia's name to exert undue influence."  (Haga Decl. ¶ 19.)

While the impetus is disputed, following their meeting, Ellipsis and Wade entered into an agreement whereupon TCW would provide price quotes for the production and decoration of face plates with various camouflage patterns and, pursuant to the terms of the quote, Ellipsis could purchase face plates at the stated price. (Haga Decl. ¶ 7.)  TCW provided the first price quote to Ellipsis eleven months later, in January 2002.[2] (Wade Dep. I at 101; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mot.") Ex. 6.)  Wade contends that during the interim eleven months between her meeting with Haga and receipt of the first quote, she made repeated attempts to obtain a quote but

---

[2]  The Court notes that Wade's response to the Defendant's statement of material facts indicates that Ellipsis obtained the right to purchase decorated face plates from TCW as of December 2001.  (Pl.'s Resp. Def.'s Statement Mat. Facts at ¶ 13.)  However, the testimony cited as well as the price quotes submitted by the parties do not indicate that a quote was provided prior to January 17, 2002.

to no avail.[3]  (Wade Dep. I  at 101-02.)  The price quotes did not provide a specific delivery schedule, but rather stated that "[l]ead time is based upon availability." (Def.'s Mot. Ex. 6.)  The quotes also stated that a minimum purchase order per stock keeping unit ("sku") of 500 units is presumed.[4]  (Def.'s Mot. Ex. 6.)  Ellipsis and Wade continued to conduct business pursuant to this arrangement until March 2003.  (Aff. Mary Elizabeth Wade ("Wade Aff.") ¶ 4.)  While there was no formal dissolution to the relationship, the companies have had no contact concerning the production of face plates since that time.  (Wade Aff. ¶ 4.)

Ellipsis contends that, during their business relationship, TCW was often either late or unable to fill purchase orders. (Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") at 8.)   As a result, the company maintains that it suffered damages in the form of missed business opportunities with Wal-Mart, Cabela's[5] and SunCom.  (Pl.'s Resp. at 9.)  Ellipsis submits that it did not seek to utilize a different vendor because, as a result of Haga's representations, the company believed that TCW was the only Nokia authorized decorator.  In the summer of 2002 Wade contacted Gabriela Sanchez, Channel Development Manager of Nokia, and was informed that TCW was not the only Nokia authorized decorator in the United States and further, that the company was not authorized to "police" Nokia's intellectual property.  (Wade Dep. I 60-63; 250-51; Aff. Gabriela Sanchez

---

[3]  In contrast, TCW maintains that, at least as late as August 2001, Wade expressed to TCW that she was not ready to begin doing business with TCW until due diligence was completed.  (Def.'s Mot. Ex. 10.)  Wade contends that the letter cited in support of TCW's position concerns an agreement for TCW to sell Realtree products unrelated to the production of face plates.  (Aff. Mary Elizabeth Wade ("Wade Aff.") ¶ 9.)

[4]  Wade contends that Haga waived the minimum purchase order requirements for Ellipsis. (Wade Dep. at 198-99; 201-202.)

[5]  Cabela's produces and markets accessory catalogues.  (Aff. Ryan Wellman ("Wellman Aff.") ¶¶ 4-7.)

("Sanchez Aff.") ¶¶ 6, 7.)

<u>STANDARD OF REVIEW</u>

Rule 56( c) provides that a

judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

F<small>ED</small>. R. C<small>IV</small>. P. 56©; <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Canderm Pharmacal,</u>

<u>Ltd. v. Elder Pharmaceuticals, Inc.</u>, 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for

summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.

<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  When the

motion is supported by documentary proof such as depositions and affidavits, the nonmoving party

may not rest on his pleadings but, rather, must present some "specific facts showing that there is a

genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324.  It is not sufficient "simply [to] show that there

is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586.

These facts must be more than a scintilla of evidence and must meet the standard of whether a

reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled

to a verdict. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  Summary judgment must

be entered "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial."

<u>Celotex</u>, 477 U.S. at 322.  In this circuit, "this requires the nonmoving party to 'put up or shut up'

[on] the critical issues of [his] asserted causes of action." <u>Lord v. Saratoga Capital, Inc.</u>, 920 F.

Supp. 840, 847 (W.D. Tenn. 1995) (citing <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1478 (6th

Cir. 1989)).  Finally, the "judge may not make credibility determinations or weigh the evidence."

5

Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

ANALYSIS

I. TCW's Motion for Summary Judgment

Ellipsis's claims against TCW arise from misrepresentations the Defendant-company allegedly made regarding the scope of its relationship with Nokia, its capacity to timely produce and deliver face plates, and its willingness to advance-manufacture and stock those items for Ellipsis to ensure timely delivery to its customers.  Ellipsis contends that, in reliance on these statements, it severed an existing business relationship with its former supplier, Jim Palmer & Associates and, to its detriment, entered into a relationship with TCW.  As a direct result of TCW's misrepresentations, Ellipsis argues that it suffered a myriad of damages, generally relating to either TCW's delay in providing an initial price quote; unwillingness to modify the terms therein; or consistent late delivery.  The crux of TCW's motion for summary judgment is that Ellipsis has failed to offer any admissible evidence demonstrating that the company suffered damages as a result of the alleged actions by TCW.

The parties are in agreement that, in order to prevail on its claims for fraud, tortious interference with business relationships, and violation of the TCPA, Ellipsis must demonstrate that it suffered damages.  See Bowman v. Waggoner, No. M2004-00411-COA-R3-CV, 2006 WL 140377, *4 n.5 (Tenn. Ct. App. Jan. 17, 2006) (citing Allied Sound, Inc. v. Neely, 58 S.W.3d 119, 122 (Tenn. Ct. App.2001)) ("In a claim based on fraud the plaintiff must show he suffered damage as a result of the misrepresentation.");  Swift Freedom Aviation, LLC v. Aero, No. 1:04-CV-90, 2005 WL 2246256, *18 (E.D. Tenn. Sept. 13, 2005) (granting summary judgment on TCPA claim where plaintiffs failed to demonstrate that the allegedly deceptive practices caused their injuries, "an

6

essential element of these claims."); <u>Trau-Med of America, Inc. v. Allstate Ins. Co.</u>, 71 S.W.3d 691, (Tenn. 2002) (holding that damages are an element of the tort of interference with business relations); <u>Wood v. Woodhaven Memory Gardens, Inc.</u>, 1991 WL 112273, *5 (Tenn. App. June 27, 1991) (noting that the TCPA has generally been interpreted as limiting recovery to actual damages, or those "indicated by some loss supported by proof."). Further, where a plaintiff fails to prove any actual damages in tort, punitive damages are not available. <u>Shockley v. Crosby</u>, No. 003-00794-COA-R3-CV, 2004 WL 2113052, *13 (Tenn. Ct. App. Sept. 21, 2005).

Ellipsis asserts several allegations from which it claims to have suffered damages. First, the Plaintiff contends that, as a result of TCW's misrepresentations, it was injured through lost business opportunities with Wal-Mart, Cabela's and SunCom. Regarding Wal-Mart, it maintains that

> [i]n the fall of 2002, Michael Bray of Wal-Mart wanted POP displays of Ellipsis' camouflage pattern cellular telephone face plates for 500 stores. Bray had approved the POP displays. However, TCW refused to give Ellipsis a firm delivery schedule, and refused to extend its quote pricing [sic] in writing past 30 days. Wal-Mart requires one-year firm price quotes and firm delivery dates with a shipping window of 7 to 10 days. As a result of TCW's refusal, Ellipsis had to decline Wal-Mart's proposal, which ultimately would have resulted in Ellipsis' sale of approximately 30,000 face plates, or possibly more, to Wal-Mart.

(Def.'s Mot. Ex. 3 at 2, 18.) In the instant motion, TCW contends that its refusal to provide a one-year quote was not the reason that Ellipsis did not enter into an agreement with Wal-Mart because Wal-Mart did not request and does not require, as a standard practice, a one-year price quote from its vendors. (Dep. Michael Bray ("Bray Dep.") at 17-18.) Further, the Defendant argues that Ellipsis has failed to offer any evidence, such as a purchase order, vendor agreement, letter of intent, or testimony, demonstrating that Wal-Mart intended to purchase camouflaged face plates from the company. (Def.'s Mot. at 18.) In response, Plaintiff presents evidence that Ellipsis requested an extended quote from TCW, as well as testimony that, while Wal-Mart did not have an "absolute

requirement" for a one-year quote, it was "common sense to hold pricing for at least a season, which is about a year." (Pl.'s Resp. at 13; Aff. Michael Bray ("Bray Aff."¶ 3.) However, Ellipsis provides no proof to respond to the Defendant's argument that the extended price quote was not a deal breaker for Wal-Mart or that any agreement between the parties was realistic in the absence of TCW's actions. In sum, Ellipsis has failed to submit evidence from which a reasonable juror could conclude that the failure of Wal-Mart to contract with Ellipsis resulted from any misrepresentations by TCW. Rather, accepting Plaintiff's argument as true, it appears only that Ellipsis was prevented from entering into an agreement with Wal-Mart because TCW would not alter its stated policies. Because Plaintiff's claims of fraud, tortious interference with business relations and violation of the TCPA each require proof that its injuries were caused by the Defendant's misrepresentations, the claims cannot survive summary judgment on the basis of damages suffered from lost business with Wal-Mart.

Regarding Cabela's, Ellipsis maintains that it lost a substantial advertising opportunity and the potential for thousands of sales as a result of TCW's misrepresentations because it was forced to find another supplier and consequently missed the advertiser's deadline for submission of product photographs for Cabela's 2004 catalogue.[6] Wade testified in her deposition that Ellipsis began investigating other suppliers in 2002. (Wade Dep. I at 250.) Further, it is undisputed that the parties had no further communications regarding the production of face plates after April 2003. (Wade Dep. I at 17; Wade Aff. ¶ 4.) After ceasing to order from TCW, Ellipsis began working with AleEv, a Nokia approved vendor. (Wade Dep. I at 266-67.) However, because AleEv was not licensed by

---

[6] A June 3, 2004 email from Wade to Ghiggins@AleEv.com states that the photograph shoot for the Cabela's catalogue was "next week." (Def.'s Mot. Ex. 22.)

Realtree to decorate using Realtree's patterns, AleEv outsourced the decoration to Coryor, a vendor in Taiwan.  (Wade Dep. I at 266-67.)

In support of its motion, TCW offers a series of email communications between Wade and various other personnel at Nokia and AleEv demonstrating Ellipsis' attempts to obtain a letter from Nokia authorizing the entry of Coryor's decorated product into the United States in time for the Cabela's submission. (Def.'s Mot. Ex. 22.)  In response, Ellipsis does not dispute that the company suffered delays due to customs requirements.  (Wade Dep. II at 118; Pl.'s Resp. Def.'s Mat. Facts at 39.)  However, it contends that TCW is still to blame because, had it not made misrepresentations to Ellipsis, the company would not have had to seek an alternative supplier and thus, would not have missed the deadline for product submission. (Pl.'s Resp at 22.)  The Court finds that this argument is untenable. The Cabela's deadline for its 2004 catalogue was in June 2004, nearly fourteen months after TCW and Ellipsis ceased to transact business involving camouflaged face plates.  Further, by Ellipsis' own admission, the delay was caused by customs issues, not any action by TCW. Specifically, Wade testified that

A:      Yes, we missed the fall catalog by a week.
Q:      Why was that?
A:      Well, the product was produced and brought in and got held up in customs.
Q:      How long was it held up in customs?
A:      One week.

(Wade Dep. II at 118-19.)  On this basis, it appears that TCW was not the cause of Ellipsis' missed advertising opportunity with Cabela's.

Ellipsis also maintains that TCW's misrepresentations damaged Plaintiff in the form of a missed business opportunity with SunCom.  (Pl.'s Resp. at 20-21.)  In support, Ellipsis offers a December 10, 2004 email allegedly directed to Wade from Jim Farina, who was at the time an

Accessory Product Manager with SunCom, stating that he and Wade scheduled a sales meeting in the summer of 2001 but that "Elizabeth was unable to attend and forced to cancel the meeting." (Pl.'s Resp. Ex. 6.)  As noted below, see discussion infra p.16-18, this letter is inadmissible for purposes of summary judgment because it was neither made under oath nor certified.  Furthermore, because it makes no mention of the reason the meeting was cancelled or in any way provides a basis from which this Court could conclude that TCW was to blame, this email bears no probative value on this issue.  Further, the Court notes that, even if it were to find that TCW's actions caused Wade to cancel the meeting, Ellipsis has offered no evidence, other than speculation by Wade[7], to demonstrate that it would have entered into a sales agreement with SunCom had the meeting gone forward.  Accordingly, the alleged lost business opportunity with SunCom does not support the Plaintiff's required demonstration of damages.

Plaintiff also argues that it suffered injury as a result of TCW's failure to timely produce face plates in requested quantities.  Specifically, Ellipsis claims that TCW failed to fill its orders in 2002, was often late with deliveries, and on specific occasions lost an order and improperly processed another.  (Pl.'s Resp. at 17-19; Ex. 8.)  Despite Plaintiff's contentions, a review of the documents cited in support of its position indicates that all orders by Ellipsis in 2002 were shipped by TCW in 2002 with two exceptions.  On January 14, 2003 and January 31, 2003, TCW produced two invoices

---

[7] Specifically, Wade testified in her deposition as follows:

Q:      [O]ther than your own speculation, you have no empirical evidence to suggest
        that you would have gotten a huge order from SunCom?
A:      I believe we would have gotten an order from SunCom.
Q:      Belief, but you have nothing to base that on.  There's no track record, correct?
A:      That's correct.
(Dep. Mary Elizabeth Wade (May 3, 2005 )("Wade Dep. II") at 141-42.)

related to purchase order 2172, which was submitted by Ellipsis on November 12, 2002.[8]  (Pl.'s

Resp Ex. 8, CW 0200, CW0201.)   However, upon closer review, it appears that all quantities

requested on Purchase Order 2172 were accounted for on 2002 invoices.[9]   (Pl.'s Resp. Ex. 8,

CW0104, CW0197.)   Consistent with this finding, TCW submits the testimony of Susie Barham

stating that, based on a comparison of the invoices and purchase orders, TCW filled all of Ellipsis'

orders in 2002.  (Decl. Susie Barham ("Barham Decl.") ¶ 7.)

       While it is disputed whether TCW promised a specific delivery time frame, the Plaintiff has

failed to demonstrate how, even if TCW's shipments were late, their untimeliness resulted in injury

to it.  The sole evidence offered by Ellipsis in regard to damages sustained by late deliveries is the

affidavit of Ellipsis employee Suzanne Guymon[10], who stated that

> I recall many delayed shipments and back orders from [TCW].  I was also aware pf
> the overnight charges which resulted from [TCW's] late shipments to Ellipsis.
> Ellipsis carried the majority of that expense.

(Aff. Suzanne Guymon ("Guymon Aff.") ¶ 6.)  Other than this vague statement, Plaintiff has not

offered any evidence to demonstrate what shipments were late and whether the injury suffered as

a result was due to a misrepresentation by the defendant.  Ellipsis also offers a June 3, 2002 letter

---

[8]  Ellipsis has presented no other TCW invoices from 2003.

[9]  TCW's Invoice dated January 14, 2003 related to the delivery of a quantity of fifteen (15) of the product N3360-430-80 and sixteen (16) of the product N3360-429-80.  (Pl.'S Resp Ex. 6, CW0200) The January 31, 2003 invoice referenced delivery of a quantity of fifteen (15) of the product N3360-430-80.  (Pl.'s Resp. Ex. 6, CW0201.)
    Purchase Order 2172, to which the referenced invoices relate, requested a total quantity of 115 of the product N3360-430-80 and 143 of the product N3360-429-80. (Pl.'s Resp. Ex. 6, CW0104.)  TCW Invoice dated December 16, 2002 accounts for all 115 of requested product N3360-430-80 and all 143 of product N3360-429-80 requested in Purchase Order 2172. (Pl.'s Resp. Ex. 6, CW0197.)

[10]  During the relevant time period, Guymon was in charge of "purchasing, shipping and handling, purchase orders, and invoicing" at Ellipsis.  (Guymon Aff. ¶ 5.)

from Susan Barham, a Sales and Marketing Executive Assistant for the Sporting Goods/Licensing Department of TCW, to Ellipsis in which she stated:

> Guess What!  Finally, please find enclosed 4 of the Kyocera 2035 in the Wetlands pattern.  I apologize for how long this took, our lab in Greensboro facility is so busy.

(Pl.'s Resp. Ex. 7; Barham Decl.¶ 2.) According to Ellipsis, the price quote for the product referenced in the June 3, 2002 letter was issued by TCW on January 17, 2002. (Pl.'s Resp. at 11.) While Ellipsis does not indicate when the purchase order for the product Barham discussed was submitted, the January 17, 2002 price quote stated that it was valid for thirty (30) days.  (Def.'s Mot. Ex. 6 at E-0038.)  Accordingly, it can be inferred that the product was ordered sometime prior to February 17, 2002.  Regardless, this evidence says nothing of any injury to Ellipsis as a result of a late delivery.  Similarly, the Court dismisses Ellipsis' evidence that TCW lost an order that was subsequently resent on November 12, 2002 and did not properly process another order.  (Pl.'s Resp. at 12.)  Even if true, these facts say nothing about the impact on Ellipsis or its relation to alleged misrepresentations by TCW.

Ellipsis next maintains that, as a result of TCW's delay in providing a price quote in 2001, it suffered damages in the form of lost profits because it was unable to sell camouflaged face plates during this period. (Pl.'s Resp at 16.) Wade insists that she orally requested a price quote from TCW on many occasions in the period between her initial meeting with Haga in February 2001 and receipt of the price quote eleven months later.[11]  (Pl.'s Resp. at 7; Wade Dep. I at 101.) In support, Ellipsis offers the phone records of Wade which demonstrate nineteen calls to Plaintiff during the period of February 2001 to August 2001, as well as an affidavit of an Ellipsis employee, Suzanne Guymon,

---

[11]  Wade testified in her deposition that she did not receive a written price quote from TCW until January 2002.  However, she placed an order in December 2001 based on an oral price quote she received from Haga that month.

stating that she "was aware of how often [Wade] attempted to get price quotes from [TCW]." (Pl.'s Resp. Ex. 4; Guymon Aff. ¶ 6.) In its motion, TCW maintains that Wade did not request a quote in writing until November of 2001, and furthermore, that it was not in Ellipsis' interest to obtain a quote prior to this time because, during 2001, the company was selling its remaining inventory from its previous supplier, Jim Palmer & Associates. (Def.'s Mot. at 13-14.)

Even assuming that TCW delayed supplying a price quote despite representations that it would be provided, the Court finds that Ellipsis has failed to establish that it suffered injuries as a result of that conduct. Wade's own testimony establishes that Ellipsis filled orders in 2001 from its remaining inventory with Jim Palmer & Associates. (Wade Dep. II. at 10-14.) It maintains, however, that it was injured because it was "forced to fill small orders from [its] inventory."[12] Ellipsis has presented no evidence demonstrating that it was unable to fill any orders because of a lack of inventory during this period which could be attributed to TCW's delay. Rather, Wade testified at her May 2005 deposition that "a lot of [the inventory] is still in my showroom." (Wade Dep. II at 10.) Ellipsis also argues that it was unable to conduct sales and marketing in 2001 because of TCW's failure to provide a quote. (Pl.'s Resp. at 11.) In support of this argument, Ellipsis offers the December 10, 2004 email communication from Jim Farina, which, as noted below, is inadmissible for summary judgment purposes because it is neither sworn to nor certified. See discussion infra p.16-18; FED. R. CIV. P. 56(e); Pl.'s Resp. Ex. 6.) However, even considering this letter, the Court notes that it does not provide support for Plaintiff's contention because it neither mentions TCW's failure to provide a quote or Ellipsis' claimed inability to conduct sales or

---

[12] Both Ellipsis and TCW submit evidence regarding the number and duration of phone calls between Wade and TCW during the period between Wade's initial meeting with Haga and her receipt of a price quote. (Def.'s Mot. Ex. 8, at 12-13; Pl.'s Resp. Ex. 4.) However, without evidence regarding the subject matter or nature of the communications, they are not relevant to resolution of this matter.

13

advertising.  Rather, the letter simply states that Wade was "unable to attend" a scheduled appointment. (Pl.'s Resp. Ex. 6.) The facts submitted demonstrate that Ellipsis continued to sell camouflaged face plates to customers throughout 2001 (Dep. Wade II at 10-14.)  Because the Plaintiff has presented no evidence from which a reasonable jury could conclude that it was unable to sell face plates during this period or suffered any other injury as a result of the alleged failure of TCW to provide a quote, this "evidence" cannot form the basis of the claims asserted.

Ellipsis makes passing reference to injuries suffered as a result of TCW's false representations that it would hold inventory of its camouflaged face plates to ensure timely delivery. (Pl.'s Resp. at 18.)  Again, the Plaintiff does not offer any evidence demonstrating that, as a result of TCW's failure to do so, it suffered damages.

Finally, Ellipsis asserts that the damages it suffered as a result of TCW's actions can be approximated based on a market study from which TCW estimated a sizeable potential retail market for face plates for the Nokia 5100-series phone.  (Pl.'s Resp. at 22-23.)  Specifically, Mike Carnahan, a former employee of TCW, testified that while he was an employee at the company, he

> gathered information which resulted in a forecast assumption which estimated 1.5 million buys in the camouflage market.  The information was gathered from two market research firms, Look Look and Youth Intelligence, as well as from numbers from Nokia.  During my employment at Nokia, Nokia had worldwide sales of the 5100 series cell phones of at least 90 million units, and continued to produce this handset model for several years after I left.  At the time I worked for [TCW], the number of 5100-series handsets in use in the U.S. peaked at approximately 25 million.  Of that base 25 million users, at least 1/4 of these would fit a market segment we identified as "Urban Youth." And based on market data, we knew that camouflaged patterns would do well in this segment.  In a retail display of 4 or 5 different colors and patterns for face plates for the Nokia 5100-series phone, we estimated that 25% of the sales and patterns would be in camouflage-patterned product.  That works out to 1.5 million potential unit sales.

(Aff. Mike Carnahan ("Carnahan Aff.") ¶ 8.)  Carnahan's affidavit does not state how many of the

potential purchasers of camouflaged face plates were expected to make a purchase nor does he opine as to how many would ultimately purchase them from Ellipsis.  Even assuming that this market study was accurate, Plaintiff has offered no proof to demonstrate that it did not capture its potential share of the market or how TCW might be related to that failure.  Other than pure conjecture, there is no basis from which the Court can infer from the offered market study that TCW caused injury to Ellipsis.

Based on the above, the Court finds that Plaintiff has failed to demonstrate that it suffered injury as a result of TCW's alleged misrepresentations.  Because the Plaintiff cannot prevail, as a matter of law, on its claims of fraud, tortious interference with business relationships, and violation of the TCPA, without such a showing, the Defendant's motion for summary judgment is GRANTED.

## II. Ellipsis and Wade's Motion for Partial Summary Judgment

In their joint motion for partial summary judgment, Ellipsis and Wade argue that they are entitled to judgment as a matter of law on all causes of action asserted by TCW in the counterclaim and third-party complaint except those relating to a sworn account.  The Court will address each cause of action in turn.

### A. Defamation

In the third-party complaint and counterclaim, TCW alleges that Wade, in both her individual capacity and as President of Ellipsis, willfully and maliciously made false and disparaging written or oral statements about it to third-parties, including, Realtree, Motorola, Cabela's, Page Plus Cellular ("Cingular"), SunCom, Nokia, and Wal-Mart.  (Counterclaim and Third-Party Compl. ("TP Compl.") ¶¶ 16-19.)  In support of its contention, TCW offers the following evidence which it

alleges to either contain or reference a defamatory statement by Wade: (1) a November 8, 2004 letter from Gabriela Sanchez of Nokia, Inc. to Wade ("Sanchez Letter"); (2) a December 10, 2004 email from Jim Farina to Wade ("Farina Letter"); (3) a December 15, 2004 letter from Gregg Kidd of Cingular to an unidentified party ("Kidd letter"); (4) testimony of John Bilger ("Bilger") of TCW regarding a telephone call from Carlos Coroalles, the Director of Companion Products Accessory Division of Motorola; (5) deposition testimony by Wade regarding statements she made to representatives of Nokia and Realtree; and (6) deposition testimony by Keith Jennings of Realtree. (Third-Party Plaintiff's Mem. Opp. Counterdefendant & Third-Party Defendant's Mot. Summ. J. ("TPP Resp.") at 3-6.)

As a preliminary matter, the Court must address the admissibility of the evidence cited by TCW.  In their motion, Ellipsis and Wade contend that the letters referenced above in support of TCW's defamation claim are inadmissible hearsay.  (Counterdefendant & Third-Party Defendant's Mem. Supp. Mot. Partial Summ. J. ("TPD Mot.") at 6.)  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c).  Hearsay evidence may not be considered on a motion for summary judgment. Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 927 (6th Cir.1999).  Further, pursuant to Federal Rule of Civil Procedure 56(e), to be considered for summary judgment purposes, all documents attached to a motion must be properly authenticated. FED. R. CIV. P. 56(e); see also 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* Civ.3d § 2722 ("a letter submitted for consideration under Rule 56(e) must be attached to an affidavit and authenticated by its author in the affidavit or a deposition."). Authentication "is satisfied by evidence sufficient to support a finding that the matter in question

16

is what its proponent claims," including testimony of a witness with knowledge "that the matter is what it claims to be." FED. R. EVID. 901(a), (b)(1). Mere attachment to a complaint does not render exhibits admissible where their authenticity is not established therein. See Szymankiewicz v. Picard, 2005 WL 1154210, *1(W.D. Wis. May 13,2005) (noting that exhibits are only admissible if averments in the affidavit or complaint "establish that the relevant exhibit is a true and correct copy of what it purports to be."). Here, the letters are not attached to affidavits or other testimony establishing their authenticity.[13] Further, the third-party complaint sets forth no facts based on personal knowledge by TCW establishing that the letters are what they purport to be.

TCW maintains that affidavits establishing the authenticity of the letters are unnecessary, however, because the writings are self-authenticating. (Third-Party Pl. Resp. Counterdefendant & Third-Party Pl.'s Statement Mat. Facts ("TPP Resp. Mat. Facts") ¶ 4.) Federal Rule of Evidence 902 provides that "extrinsic evidence of authenticity as a condition precedent to admissibility is not required" with respect to certain documents. FED. R. EVID. 902. However, because the letters do not fall within any category of self-authenticating documents enumerated under the rule, TCW's argument is without merit. FED. R. CIV. P. 56(e). TWC also maintains that authenticating testimony is not required because the letters contain the admission of a party opponent. (TPP Resp. Mat. Facts ¶ 4.) This argument is also without merit. While an admission of a party provides an

---

[13] The Court notes that, in response to the TCW's motion for summary judgement, Ellipsis submits the affidavit of Gabriela Sanchez. (Pl.'s Resp. Def.'s Statement Undisp. Mat. Facts Ex. 5.) However, the affidavit makes no mention of the December 8, 2004 letter or provides any information indicating that the letter is what it purports to be. Further, Wade's deposition testimony references a letter from Sanchez, although, again, the testimony provides no evidence from which the Court can conclude that the letter attached to the complaint is an authentic copy. (Wade Dep. II at 314-15.) Without more, this testimony cannot establish the authenticity of the letter. Szymankiewicz, 2005 WL 1154210 at *1 (finding that, to support admissibility, the averments in the affidavit must "establish that the relevant exhibit is a true and correct copy of what it purports to be.").

exception permitting the consideration of otherwise inadmissible hearsay, it does not excuse the requirement that the document be authenticated.  See Select Creations, Inc. v. Paliafito America, Inc., 830 F. Supp. 1223, 1238-39 (E.D. Wis. 1993) (finding that even under the exception for admissions by a party-opponent, FED. R. EVID. 801(d)(2), a document is inadmissible if not authenticated as required by Rule 901.)   Accordingly, because the letters attached to the counterclaim and third-party complaint are not sworn to or certified, they are not properly authenticated and are therefore inadmissible for consideration on the instant motion. Moore v. Holbrook,  2 F.3d 697, 699 (6th Cir. 1993) ("This court has ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded.").

TCW also cites, as evidence of its claim of defamation, the testimony of Bilger that Wade made derogatory statements regarding TCW to a "high ranking individual" at Motorola. Specifically, Bilger states that

> . . . the very first time that Ellipsis made its way to the forefront of my attention, was when I received a call from Carlos Coroalles, then the Director of Motorola's Companion Products Accessory Division, advising me that a high ranking individual from Motorola had received a call from Ellipsis complaining about TCW.  Mr. Coroalles specifically advised me that Motorola did not appreciate the disruption, and that the 'situation' needed to be rectified quickly.

(Decl. John L. Bilger ("Bilger Decl.") ¶¶ 6-7.)  Similarly, in his deposition, Bilger testified to the injurious nature of the alleged comments by Wade.

> Q:  Do you have any factual information as to why [a decrease in TCW's business with Motorola and Nokia] happened?
>
> A: None other than the specific phone call that I received from Carlos Coroalles asking if I knew who Elizabeth Wade and Ellipsis was because he had received a phone call from someone superior to him complaining that that person had been called and that this person had alleged that Color Works was either late, no good to

do business with, had disappointed her, and that Carlos was asked to find out what was going on -

 . . .

Q. Do you know any specific statement that was attributed to Elizabeth Wade concerning this defamation claim, of your own personal knowledge?

A: I know - I know Carlos described statements, but their specifics I can't remember at this time.

(Dep. John L. Bilger ("Bilger Dep.") at 114-115.)

There are three out-of-court statements contained in Bilger's testimony: (1) Wade's statement to an unidentified "high ranking individual" at Motorola; (2) the unidentified party's statement to Coroalles; and (3) Coroalles' statement to Bilger. To determine whether Bilger's testimony is admissible, the Court must consider the admissibility of each statement. See FED. R. EVID. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules"); United States v. Payne, 437 F.3d 540, 547 (6th Cir. 2006) ("In order to admit an out-of-court statement that is nested within another, Rule 805 requires that [all] statements be admissible.").

TCW first argues that the statements to which Bilger testifies are not hearsay because, rather than the truth of the matter asserted, they are offered to "memorialize the substance" of what Wade said to third-parties. (TPP Resp. at 6.) Out-of-court statements not offered for their truth are not hearsay, and as such, their admission does not violate the hearsay rule. United States v. Johnson, 71 F.3d 539, 543 (6th Cir.1995). However, both Coroalles' statement to Bilger and the unidentified speaker's statement to Coroalles are hearsay as they are statements asserting that Wade called Motorola and made derogatory statements about TCW offered by TCW to prove just that fact. Accordingly, both statements are inadmissible hearsay. FED. R. EVID. 801(c); Jacklyn, 176 F.3d

921 at 927.  Conversely, Wade's statement to the unidentified executive at Motorola, asserting that TCW was late, no good to do business with or had disappointed her, when offered simply to memorialize that she made the statement rather than to establish that TCW had such poor service is not hearsay.  Had TCW presented the testimony of the unidentified speaker to whom Wade allegedly made this statement, it would be admissible.  See FED. R. EVID. 801(d)(2)(A); United States v. Maliszewski, 161 F.3d 992, 1007-08 (6th Cir. 1998).  However, because the admission of Wade's conversation is perched on the backs of two subsequent nonadmissible statements, the evidence cannot be considered for purposes of summary judgment. See Daily Press, Inc. v. United Press Int'l, 412 F.2d 126, 133 (6th Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969) (noting that hearsay evidence cannot be considered on a motion for summary judgment); but see FED.R.EVID. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

TCW also maintains that Bilger's testimony is admissible because it is not hearsay, but rather, an admissible admission of a party opponent.  (TPP Resp. at 6.)  Federal Rule of Evidence 801(d)(2)(A) provides that a party's statement offered against that party is not hearsay.  FED. R. ENID. 801(d)(2)(A).  According to TCW, because the statement made by Wade was relayed to Bilger by a "complete third-party," it is admissible even though not made directly to Bilger. In support of its argument, TCW cites Doe v. Memphis City Schools, No. 04-2283 MA V, 2005 WL 2113811, *3 (W.D. Tenn. Aug. 26, 2005), in which this Court permitted the testimony of Doe that Peterson was advised by Faulkner to stop taking Faulkner off campus to prove that Faulkner knew that a relationship existed between Doe and Peterson. Doe, 2005 WL 2113811 at*3. The Court concluded

that because both Doe and Peterson were defendants in the case, Faulkner's statement to Peterson and Peterson's statement to Doe could be deemed party admissions. <u>Id.</u>  However, unlike in <u>Doe</u>, only the first speaker in the instant chain of communications is a party to the action.  <u>See</u> FED. R. ENID. 801(d)(2)(A).  TCW is correct that a statement by a party's "agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" may constitute a party admission.  <u>See</u> FED. R. EVID. 801(d)(2).  However, TCW has not demonstrated that both Coroalles and the unidentified speaker were acting as agents of Wade or any other party when the statements were made.  Thus, while Wade's complaint to the high ranking individual could be deemed a party admission, TCW has pointed to and the Court is aware of no exception or exclusion to the hearsay rule to permit the consideration of the remaining out-of-court statements.  Accordingly, Bilger's testimony as to a conversation with Coroalles about what an unidentified individual told Coroalles that Wade stated, is inadmissible hearsay and will not be considered here.  <u>See</u> <u>Baron v. City of Highland Park</u>, No. 97 C 1539, 1998 WL 901700, *4 (N.D. Ill. Dec. 17, 1998) (finding that in the case of double hearsay, even if the original statement qualified for an exclusion from the hearsay rule, it was inadmissible where there was no applicable hearsay exception or exclusion covering the remaining links in chain of communication).

Accordingly, to survive summary judgment, TCW must demonstrate that a genuine issue of material fact exists regarding its claim of defamation based upon the remaining admissible evidence, namely the deposition testimony of Wade and Jennings.  "To establish a prima facie case of defamation in Tennessee, the plaintiff must establish that: (1) a party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement."

21

Sullivan v. Baptist Memorial Hosp., 995 S.W.2d 569, 571 (Tenn. 1999). "The [P]laintiff must prove actual injury from the alleged defamation." Henderson v. Clear Channel Broadcasting, Inc., No. W2004-02903-COA-R3-CV, 2005 WL 2333593, *4 (Tenn. Ct. App. Sept. 21, 2005). TCW contends that Wade's own deposition testimony establishes that she that made disparaging and false statements to Nokia and Realtree. Regarding her statements to Nokia, Wade testified that

> A:  . . . I called Nokia to tell them of what I had been told.  They said, "No, that's not correct.  That [TCW] is not the only Nokia approved company in the United States; we have five."  So, I sent – I called Realtree to inform them of this . . .
>
>  . . .
>
> Q: Okay.  It's your testimony that you then contacted [Nokia], I believe, in the summer of '02 about Mr. Haga's representations concerning the Nokia OK issue , and who could decorate for Nokia; is that correct?
>
> A: Yes, sir.
>
> . . .
>
> A: It is my testimony that Ms. Sanchez [of Nokia] said they would never have sued me, and they don't do business that way.  And, [TCW] did not have the authority to tell anyone that they were policing the environment for them.

(Wade Dep. I at 52, 81; Wade Dep. II at  314-15.)  In reference to her communications with Realtree, Wade testified as follows:

> Q: Did you confront Mr. Haga in writing after you found out from Ms. Sanchez [of Nokia] that his alleged representations to you were untrue?
>
> A: No.
>
> Q: Why not?
>
> A: Well, initially out of shock.  So, I called Realtree.
>
> Q: What did they tell you?
>
> A: They were shocked as well.

22

Q: They had no knowledge of this?

A: Correct.

(Wade Dep. I at 83.) Jennings of Realtree also testified as to conversations with Wade regarding

TCW.

Q: Did you – before the litigation did you have conversations with Ms. Wade about her issues with [TCW]?

A: Sure.

Q: What did you discuss with her?

A: Well, lots of times, if I didn't here from Lamie [Haga of TCW], I would hear from them.

Q: Them being Ellipsis?

A: Sure.  You know, I can't fill – and here's why.  Ellipsis would tell me the other side of the story because if [Cabela's] didn't get a licensed product, whether it's a jacket or a bow or a face plate, guess who [Cabela's] is going to call?  Me, because ultimately our finger is on every aspect of the product.  So they're going to call because, they'll know that we'll be able to find out what is the hold up.  So, Ellipsis, knowing that [Cabela's] is going to call me if they don't get their product will call ahead of time and say [Cabela's] isn't getting their product and here is why.  So when [Cabela's] calls I can head them off at the pass, say be patient, it will probably be there in about 10 days, defuse the whole thing, and on we go.

Q: And what was Ellipsis telling you was the problem?

A: There was a lot of – there was a lot of, you know, just a lot of stuff.  I remember the orders weren't being shipped, orders weren't being shipped complete, orders just not being turned around fast enough to meet the customer demands, those types of things, is all I can really remember.  It all boiled down to, you know, speed in which product could be processed, shipped, and delivered . . .

(Jennings Dep. at 53-54.)

The parties dispute the veracity of the statements made by Wade to Nokia and Realtree

regarding the timeliness of TCW's deliveries as well as whether TCW did in fact represent to Wade

23

and Ellipsis that it was the only authorized Nokia OK dealer in the United States.[14]  Further, it is

disputed whether, as a result of these statements, TCW suffered damages.  TCW maintains that,

following Wade's statements to Nokia, it suffered a significant decrease in business with the

company.  (Haga Decl. ¶¶ 20,21.)  Specifically, TCW contends that Nokia's average yearly order

decreased from 2,595,911 face plates in the four years prior to Wade's statements to Nokia to 108,

292 per year in 2003 and 2004.  (Haga Decl. ¶¶ 20, 21.)  Wade and Ellipsis, in their motion for

summary judgment, argue that the decrease in business experienced by TCW was consistent with

the market for face plates, which, by TCW's own argument, was a "fad" beginning to experience

a decline in demand.[15]  (See TPD Mot. Ex. 14 at 11.)  While TCW concedes that there may be other

causes for the decrease, it contends that the temporal proximity of the statements to the decrease in

business raise a genuine issue for trial.

    The Court concludes that there is a genuine issue of material fact as to whether the

statements by Wade recounted above were made with awareness of their falsity or reckless disregard

----

[14]  Regarding the accuracy of Wade's statements to Sanchez, Haga asserted in his declaration that
    [f]or Ellipsis to state or otherwise suggest to Nokia that TCW had overstated the bounds
    of TCW's vendor agreement with Nokia and/or otherwise attempted to use Nokia's name
    to exert undue influence, is untrue and damaging both to TCW's reputation and TCW's
    relationship with Nokia.
(Haga Decl. ¶ 19.)

[15]  In TCW's memorandum in support of its Daubert-based motion to exclude the testimony of
Ellipsis' experts, TCW criticized the expert's calculation of damages on grounds that they failed to
consider that
    (1) face plates in general were a fad; (2) the impact of new technology, specifically the
    increasing popularity of flip phones, where were largely not accommodating to
    replaceable face plates; (3) that Ellipsis lost its alleged exclusive right to market Realtree
    camouflage designs on face plates in December of 2003; and (4) that several large
    retailers, most notably Wal-Mart and Cabela's, had designed their own proprietary
    camouflage patterns for decorating hard goods to compete with Realtree and Mossy Oak.
    Anyone with even a passing knowledge of the cell phone face plate business would have
    been aware of these market forces.
(TCW's Mem. Supp. Daubert-based Mot. Exclude Expert Test. Patzer & Ivy at 11.)

for their truth and whether, as a result, TCW suffered damages.  Accordingly, disposition of this cause of action by summary judgment is not appropriate.  However, because TCW has set forth evidence of defamatory statements by Wade to Realtree and Nokia, but has shown proof of damages to its business relationship as a result of those statements only in regard to Nokia, only evidence relating to that claim may be presented at trial.  Quality Auto Parts Co., Inc. v. Bluff City Buick, Inc., 876 S.W.2d 818, 820 (Tenn. 1994).

### B. Tortious Interference with Business Relations

Wade and Ellipsis next contend that summary judgment in their favor is appropriate on TCW's claim for tortious interference with business relations.  Under Tennessee law, to establish such a claim, a plaintiff must demonstrate:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;(2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, and finally, (5) damages resulting from the tortious interference.

Trau-Med of America, Inc., 71 S.W.3d at 701(emphasis and internal citations omitted).  Wade and Ellipsis argue that TCW has failed to set forth sufficient facts demonstrating that they intentionally utilized any improper means to interfere with TCW's business relationships or that TCW suffered damages as a result of their conduct. (TPD Mot. at 15.)

TCW appears to assert its  tortious interference cause of action on the alleged defamation by Wade of TCW to Motorola and Nokia.  (TPP Resp. at 9.)  However, as explained above, TCW has presented no admissible evidence demonstrating that Wade or Ellipsis made any defamatory statements regarding TCW to Motorola.  As to Nokia, TCW argues that Wade's derogatory and false statements to Sanchez indicating that it represented to Wade and Ellipsis that the company was the

sole authorized Nokia-OK dealer in the United States and that it was authorized to police Nokia's intellectual property demonstrate an improper motive to injure the company in its relationship with Nokia.  (TPP Resp. at 9.)  Further, it maintains that the decrease in its business with Nokia subsequent to Wade's statements demonstrates that the company suffered damages from their tortious interference.  (TPP Resp. at 9.)

Improper motive "is dependent on the particular facts and circumstances of a given case," but specifically requires a finding that "the defendant's predominant purpose was to injure the plaintiff."  Trau-Med, 71 S.W.3d at 701 n.5.  The definition of improper interference specifically includes "misrepresentation or deceit, [or] defamation."  Id.  As previously discussed, a genuine issue of fact exists regarding whether Wade's statements to Sanchez were defamatory or false.  As evidence of damages, TCW notes that, in the four years prior to Wade's comments to Sanchez, the company processed an average of 2,595,911 face plates per year for Nokia.  (Haga Decl. at 20.) Subsequent to Wade's alleged defamation of TCW in the summer of 2002, the average dropped to only 108, 296 face plates per year in the years 2003 and 2004.  (Haga Decl. at 21.) Based on the temporal proximity between the alleged statements by Wade and the decline in Nokia's business with TCW, a reasonable juror could conclude that the alleged statements by Wade caused a tortious interference with the business relations between TCW and Nokia.  Accordingly, summary judgment on TCW's tortious interference with business relationships claim as to its relationship with Nokia is DENIED.

### C. Inducement of Breach of Contract

TCW does not respond to Wade and Ellipsis' argument that summary judgment is appropriate on its inducement of breach of contract claim. The Court notes that TCW entitled its

26

response to the Third-Party Plaintiff and Counterdefendant's argument for summary judgement on the tortious interference with business relations claim, "Ellipsis' and Wade's Defamatory Comments Interfered with TCW's Business Relations and Contracts," perhaps indicating that the argument which followed addressed both the tortious interference with business relations count as well as that for inducement of breach of contract. However, inducement of breach of contract, as set forth in TCW's counterclaim and third-party complaint, is a separate tort which requires showing seven elements, including the existence of a legal contract. See TSC Indus., Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn. Ct. App.1987). Because those elements have not been addressed, the Court must presume that TCW has abandoned this claim. Accordingly, summary judgment is granted to Wade and Ellipsis on the inducement of breach of contract claim.

### D. Violation of Tennessee Consumer Protection Act

The Tennessee Consumer Protection Act ("TCPA") provides consumers with a private right of action for any "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. §§ 47-18-104(a), 109(a)(1); see also Menuskin v. Williams, 145 F.3d 755, 767 (6th Cir. 1998). "The main purpose of the Act is to protect consumers[16], and it must be liberally construed to affect that purpose." Gaston v. Tennessee Farmers Mut. Ins. Co., 120 S.W.3d 815, 822 (Tenn. 2003). "In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated....'" Tucker v. Sierra

---

[16]   "[I]t is irrelevant whether a corporation is a 'consumer' under the Act because the right of action is given to "person[s]," a term that is specifically defined to include corporations." ATS Southeast, Inc. v. Carrier Corp., 18 S.W.3d 626, 629 (Tenn.2000).

Builders, No. M2003-02372-COA-R3-CV, 2005 WL 1021675, *4 (Tenn. Ct. App. April 29, 2005)

(quoting Tenn. Code Ann. § 47-18-109(a)(1)). "The defendant's conduct need not be willful or even

knowing, but if it is, the TCPA permits the trial court to award treble damages." Id.  Included in the

statute is a non-exhaustive list of thirty-two specific unfair or deceptive acts or practices which are

declared unlawful by the Act, including "[d]isparaging the goods, services or business of another

by false or misleading representations of fact."  Tenn. Code Ann. § 47-18-104(b)(8).  Statements of

opinion, even when disparaging, are not punishable under the Act.  River Park Hosp., Inc. v.

BlueCross Blue Shield of Tennessee, Inc., 173 S.W.3d 43, 61 (Tenn. Ct. App. 2002).  Further, the

Act reaches only those representations of fact that criticize or disparage the quality of the goods or

services provided. Quality Auto Parts Co., Inc., 876 S.W.2d at 822.

Ellipsis and Wade argue that they are entitled to judgment as a matter of law on TCW's

claim under the TCPA because it failed to demonstrate that Wade made a false or disparaging

statement of fact.  However, as previously discussed, TCW has presented evidence demonstrating

that Wade made statements to Nokia regarding representations TCW allegedly made about its

business relationship with Nokia.  A genuine issue of material fact exists regarding whether these

statements were in fact false or disparaging.  Further, TCW has offered evidence that it suffered a

loss of money resulting from Nokia's decrease in business with it allegedly as the result of Wade's

statements. Ellipsis and Wade contend, as noted above, that the decrease in business was not related

to Wade's statements, but rather reflected the decline of the face plate market.  However, because

a reasonable juror could find that TCW incurred an ascertainable loss of money as a result of

statements by Wade to Nokia which disparaged TCW's services by false or misleading

representations of fact, summary judgment is not appropriate. While TCW has also presented

28

evidence demonstrating potentially defamatory statements to Realtree, because no evidence has been offered to demonstrate a resulting and ascertainable loss of money or property, that claim cannot survive. Tucker, 2005 WL 1021675 at *4.

           *E. Indemnity*

     Finally, Ellipsis contends that TCW's claim for indemnity under the TCPA, Tenn. Code. Ann. § 47-18-109(e)(2), must be dismissed because there is no evidence that the claims asserted in Ellipsis' suit against TCW are frivolous or without merit. (TPD Mot. at 19.)  In response, TCW maintains that the claim is inappropriate for disposition on summary judgment because it should be considered only after the Court has ruled on the merits of the underlying suit and the pending motion for sanctions filed by TCW on the same basis. Because those issues pertaining to the underlying lawsuit have now been resolved, the Court will address the merits of TCW's indemnity claim here.

     Tenn. Code Ann. § 47-18-109(e)(2) provides that

> [i]n any private action commenced under this section, upon finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may require the person instituting the action to indemnify the defendant for any damages incurred, including reasonable attorney's fees and costs.

Tenn. Code Ann. § 47-18-109(e)(2).  "[W]hether or not to award fees is discretionary with the court."  Glanton v. Bob Parks Realty, No. M2003-01144-COA-R3-CV, 2005 WL 1021559, *9(Tenn. Ct. App. April 27, 2005).  As explained by the Tennessee Court of Appeals

> . . . the provision for attorney fees found in Tenn. Code Ann. § 47-18-109(e)(2) is designed to discourage consumers from using the Act to file frivolous or baseless claims. It is not intended to punish plaintiffs who can demonstrate wrongful acts on the part of defendants, but who are unable to prevail on their claims for other reasons. Too strict an application of this subsection would result in a "winner take all" situation, regardless of the circumstances, that would undermine the purpose of protecting the consumer. We therefore do not interpret the statutory term "without legal or factual merit" to mean without sufficient merit to prevail, but rather as so utterly lacking in an adequate factual predicate or legal ground as to make the filing

29

of such a claim highly unlikely to succeed.

Id.  In Glanton the Tennessee Court of Appeals applied this interpretation of Tenn. Code Ann. § 47-18-109(e)(2) to affirm an award of fees where the plaintiff asserted a TCPA claim based on a section that was inapplicable to her complaint and which did not prohibit the conduct alleged.  Id. at *10.  However, the plaintiff also asserted a misrepresentation claim under the TCPA, which, while not subject to dismissal on the complaint alone, was ultimately unsuccessful because the plaintiff failed to demonstrate sufficient evidence of intent.  Id.  Because the misrepresentation claim was not frivolous or without legal merit, the court found that the plaintiff should not be held to pay for the totality of the fees, but only those related to the meritless claim. Id. at *11.

In the instant order, the Court granted summary judgment on Ellipsis' claims pursuant to the TCPA on the basis that it failed to demonstrate damages through admissible evidence.  In contrast to the facts giving rise to an award of fees in Glanton, Ellipsis' complaint, on its face, did not fail to establish a legal predicate for the TCPA.  Id. at *10.  Accordingly, the Court, in its discretion, GRANTS Ellipsis and Wade's motion for summary judgment in respect to TCW's indemnity claim.

<u>CONCLUSION</u>

Based on the foregoing, the Court GRANTS the motion of the Defendant for summary judgment and GRANTS in part and DENIES in part the joint motion of the Counterdefendant and Third-Party Plaintiff for partial summary judgment on the counterclaim and third-party complaint.

**IT IS SO ORDERED** this 4th day of May 2006.

s/  J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE